J-S82021-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| SHA'RON RAYMERE WILSON | : | |
| Appellant | : | No. 471 WDA 2017 |

Appeal from the Judgment of Sentence March 9, 2017
In the Court of Common Pleas of Blair County Criminal Division at No(s):
CP-07-CR-0001613-2015,
CP-07-CR-0001618-2015

BEFORE:   BENDER, P.J.E., STEVENS*, P.J.E., and STRASSBURGER**, J.

MEMORANDUM BY STEVENS, P.J.E.:                FILED FEBRUARY 05, 2018

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Blair County following Appellant Sha'Ron Raymere Wilson's conviction by a jury on the charges of criminal conspiracy, possession with the intent to deliver a controlled substance ("PWID"), simple possession, and possession of marijuana[1] at lower court docket number CP-07-CR-0001613-2015, and conspiracy, criminal use of a communication facility, PWID, and

_____

[1] 18 Pa.C.S.A. § 903 and 35 P.S. § 780-113(a)(30), (16), and (31), respectively.  These charges stemmed from a drug transaction occurring at a Big Lots parking lot.

_____
*   Former Justice specially assigned to the Superior Court.
** Retired Senior Judge assigned to the Superior Court.

simple possession[2] at lower court docket number CP-07-CR-0001618-2015. Appellant avers (1) the trial court erred in denying his motion to suppress the physical evidence seized by the police and (2) the evidence was insufficient to sustain his convictions. After a careful review, we affirm.

The relevant facts and procedural history are as follows: Following Appellant's arrest and the filing of charges at both docket numbers indicated supra, the lower court consolidated Appellant's cases. On February 25, 2016, Appellant filed a counseled, pre-trial motion seeking to suppress the physical evidence seized by the police on July 12, 2015.

On October 5, 2016, the matter proceeded to a suppression hearing at which the sole testifying witnesses were Police Sergeants Christopher Moser and Joseph Merrill. Specifically, Sergeant Moser testified he is in charge of the Altoona Narcotics and Vice Unit, and he is a member of Blair County's West 4 Drug Task Force. N.T., 9/27/16, at 27. He estimated that he has participated in the execution of over 200 search warrants, and on July 12, 2015, he conducted a drug investigation relevant to the instant case. Id. at 28-29.

Sergeant Moser testified that, with the use of a confidential informant ("CI"), a controlled buy for heroin was arranged between the CI and Darryl

_____

[2] 18 Pa.C.S.A. §§ 903 and 7512; 35 P.S. § 780-113(a)(30) and (16), respectively. These charges stemmed from contraband seized by the police from Room 217 of a Motel 6, as well as from Appellant's person.

Lewis ("Mr. Lewis"). Id. at 29. He testified that he, Corporal Matthew Plummer, and Patrolman Crist[3] were undercover and involved in the investigation/controlled buy, which was set to occur at a Big Lots parking lot on July 12, 2015. Id. Before the appointed time, he and Patrolman Crist arrived at the Big Lots parking lot and observed Mr. Lewis meeting with an unidentified person and then walking towards the adjacent Motel 6. Id. at 30. Sergeant Moser opined that, based on his training and experience, the interaction between Mr. Lewis and the unidentified person was consistent with a drug transaction. Id.

Thereafter, Corporal Plummer, who was driving the CI, arrived at the Big Lots parking lot, and the CI exited the vehicle, calling Mr. Lewis on his cell phone to announce his arrival. Id. Mr. Lewis returned to the Big Lots parking lot, coming from the direction of the Motel 6. Id. The CI then gave Mr. Lewis $100 of pre-recorded money, and in return, Mr. Lewis gave the CI five packets of heroin. Id. at 29-30. During the transaction, Sergeant Moser moved his position so that he would be able to observe the Motel 6, as well as the Big Lots parking lot, in order to determine the room to which Mr. Lewis returned. Id. at 31.

After the controlled buy was completed, Sergeant Moser observed Mr. Lewis meet briefly with another unidentified individual in a manner consistent

_____

[3] This Court has not been provided with the full name for Patrolman Crist.

- 3 -

with drug trafficking, and he then observed Mr. Lewis return to Room 217 of the Motel 6. Id. Based on this training and experience, Sergeant Moser determined that "Mr. Lewis was coming and going from Motel 6 and there would be a supply of heroin somewhere there and he was making multiple drug deals[.]" Id. at 32.

At this point, the officers, including Sergeant Moser, briefly left the Big Lots/Motel 6 area, discussed arresting Mr. Lewis, and determined it was appropriate to obtain a search warrant for Room 217. Id. at 31. Sergeant Moser and Patrolman Crist returned to the Motel 6 and continued to conduct surveillance. Id.

During the surveillance, the officers observed another male, later identified as Appellant, looking out of Room 217's window. Id. at 32. Specifically, the male "constantly would come and go from the window, was constantly peering out." Id. at 32-33. Sergeant Moser testified that Appellant's actions were consistent with "counter-surveillance," meaning Appellant was watching the surrounding area and observing the people to whom the drugs were being sold. Id. at 33-34. He testified the aim of the "counter-surveillance" was to watch for the police, as well as determine whether the seller was "getting ripped off" by customers. Id. at 34.

At this point, Sergeant Moser observed an individual, who the police knew to be involved in drug activity, operating a vehicle with Mr. Lewis as the passenger. Id. at 33. Sergeant Moser testified he was in contact with other

officers, including Sergeant Merrill, as the police took Mr. Lewis into custody. Id. at 34. He indicated he subsequently learned the police seized a set of binoculars from the motel room, and he opined the binoculars were used for "counter-surveillance." Id.

Sergeant Merrill, a member of the Altoona Police Department and Blair County's West 4 Drug Task Force, testified that, on July 12, 2015, he received a telephone call from Sergeant Moser, who explained the CI just completed a controlled buy with Mr. Lewis, who was staying in a motel room at Motel 6. Id. at 5. Sergeant Merrill was assigned to arrest Mr. Lewis, and upon arrival at the Motel 6, he and fellow officers were "staged out of sight of the rooms." Id. At some point, Sergeant Moser advised him that Mr. Lewis had exited the motel room and was walking around the building towards Sergeant Merrill and his fellow officers. Id. at 6.

Sergeant Merrill arrested Mr. Lewis, who had a loaded handgun and six packets of heroin on his person but no motel key. Id. at 6-8. Sergeant Merrill asked Mr. Lewis who else was in the motel room, and Mr. Lewis stated "no one else [was] in the room[.]" Id. at 8. Sergeant Merrill informed him the police had the room under surveillance and a male was obviously in the room. Id. Mr. Lewis indicated the male had left and, when pressed further by Sergeant Merrill, Mr. Lewis "kind of just shrugged his shoulders and turned his head." Id. When Sergeant Merrill confronted Mr. Lewis with the fact he did not have a motel key in his possession, and asked him how he planned to

enter the motel room, Mr. Lewis indicated the other male would let him into the room. Id. at 8-9.

Sergeant Merrill testified the police's "plan was to get a search warrant for the hotel room[;]" however, since the police were aware that at least one other person occupied the room, he determined it was necessary to make a warrantless entry to secure the room and then obtain a warrant to search the room. Id. at 10. Sergeant Merrill specifically testified "at that Motel 6, we have issues from people being alerted to [the police's] presence before [the police] can even knock on the door." Id. He testified this fact, combined with Mr. Lewis' possession of a loaded handgun, created a safety concern in that there was only one way for the police to enter the motel room, facing whatever danger awaited them. Id. at 10-11. He also noted there are "civilians all around" at a motel. Id. at 22. Further, Sergeant Merrill opined that, since Mr. Lewis had been periodically "coming and going" from the room, the longer the police waited to secure the room the more evident it would be to the occupant (Appellant) that the police had arrested Mr. Lewis. Id. at 11. Sergeant Merrill testified this created "an immediate fear" that the occupant of the room would destroy evidence. Id.

Accordingly, Sergeant Merrill went to the front office and retrieved a key card for Room 217. Id. at 12. The motel staff provided him with a form, which indicated the room was rented to "Christopher Woomer," who had a Scranton address. Id. Sergeant Merrill testified he was familiar with

Christopher Woomer from prior investigations and the person occupying Room 217, who the police observed conducting "counter-surveillance," did not have a physical description consistent with that of Christopher Woomer. Id.

After securing the key card, the police approached the door of Room 217, yelled "Altoona Police," entered the room, and discovered Appellant lying on the bed. Id. at 13. The police detained Appellant and checked the room for additional people. Id. The police did not conduct a search for evidence in any manner and "simply physically occupied the room making sure it was secure." Id. at 14. The police then secured and executed a search warrant, finding a loaded handgun under a blanket where Appellant had been lying at the time of entry. Id. at 14-16. The police discovered a large amount of heroin and ammunition in the room's ceiling. Id. Further, the police found a large amount of money on Appellant's person, including $80 of the pre-recorded money from the CI's controlled buy of heroin from Mr. Lewis. Id. at 47.

On cross-examination, Sergeant Merrrill admitted the police did not "knock and announce" their presence prior to opening the door but announced their identity as they were entering the room. Id. at 19. He reiterated that, prior to entering the room, the police had safety concerns for themselves and the public, particularly since the police seized a loaded handgun from Mr. Lewis. Id. at 19-21. He opined that, in light of all of the information known

to the police at that time, "there [was] a high probability of a weapon" in the room. Id. at 21.

By opinion and order filed on November 18, 2016, the suppression court denied Appellant's motion to suppress. Specifically, the suppression court determined there were exigent circumstances sufficient to justify the police's warrantless entry into the hotel room and the police did not violate the "knock and announce" rule. The suppression court also determined the subsequent search warrant obtained by the police was supported by the necessary probable cause.

On December 8, 2016, Appellant proceeded to a jury trial at which the Commonwealth presented the testimony of several officers involved in the instant surveillance/investigation, including Sergeants Moser and Merrill, as well as a forensic scientist from the Pennsylvania State Police laboratory. Sergeants Moser's and Merrill's trial testimony regarding the controlled buy between the CI and Mr. Lewis in the Big Lots parking lot,[4] Appellant's participation in the "counter-surveillance" from Room 217 of the Motel 6, and the fact Appellant was discovered in the room upon the police's entry was substantially consistent with their suppression hearing testimony. See N.T., 12/8/16, at 51-63, 157-88.

_____

[4] Trial testimony revealed the controlled buy occurred at approximately 4:30 p.m. N.T., 12/8/16, at 102.

Sergeant Merrill specifically confirmed that, upon execution of the search warrant, the police discovered a loaded handgun under a blanket on the bed upon which Appellant had been lying when the police initially entered the room.[5] See id. at 61-62. He clarified the ammunition, which was discovered in the ceiling by 880 packets of heroin, was for the type of gun found on the bed, as opposed to the gun seized by the police from Mr. Lewis' person. Id. at 62, 71. Sergeant Merrill also confirmed the police seized a pair of binoculars from the room. Id. at 61.

Additionally, Sergeant Moser confirmed that, while Mr. Lewis had no money on his person upon his arrest, Appellant had $1,175 on his person, including $80 of the pre-recorded money used in the previous controlled buy.[6] Id. at 185-86. Further, Agent Thomas Brandt testified the police discovered a baggie of marijuana on the bathroom sink and loose marijuana on the sink's stand. Id. at 74.

With regard to the fact the room was rented in the name of "Christopher Woomer," Sergeant Merrill testified the police did not encounter a person with this name during the instant investigation; however, he explained that it is

_____

[5] Sergeant Michael Sapienza testified that, from his vantage point, Appellant was actually lying on top of the loaded gun, which was under a blanket, when the police entered the room. Id. at 91, 99. He opined Appellant would have been aware that he was lying on the gun. Id. at 100.

[6] Sergeant Moser noted the police discovered freshly purchased fast food in the motel room, and he opined the remaining missing $20 of pre-recorded money was used to buy the fast food. Id. at 187-88.

- 9 -

not uncommon for people selling drugs to rent a motel room in the name of someone else. Id. at 65.

Appellant took the stand in his own defense. Specifically, Appellant testified he had money on his person from landscaping jobs, babysitting, and "birthday money." N.T., 12/9/16, at 34-35. He explained that he wanted to go on a vacation, so he joined Mr. Lewis and "Jordan" in the motel room in Altoona with the idea of "getting some girls." Id. at 35. He testified they bought food from KFC, picked up some marijuana, picked up a speaker from Big Lots, and went to the room. Id. at 40. He testified "Jordan" arranged to get a key for the room from "Woomer;" however, Appellant never met "Woomer." Id. at 41. In any event, he testified "Jordan" was the person in possession of the key and who had opened the motel room. Id. Appellant also testified that Mr. Lewis owed him money and, while they were at Big Lots buying the speaker, Mr. Lewis repaid him $80. Id. at 44.

Appellant testified that, at some point, Mr. Lewis and "Jordan" left the room, but Appellant remained behind to "get high" and listen to music. Id. at 42. He explained he looked out of the window a few times because he had never been in Altoona and "was just looking around[.]" Id. Appellant denied knowing either that Mr. Lewis was dealing drugs, that there was contraband in the room, or that he conspired with Mr. Lewis to sell drugs. Id. at 44-48. He denied knowledge of the firearm, and he testified he never saw Mr. Lewis hide anything in the ceiling. Id. at 47.

Appellant called Mr. Lewis as a defense witness. Mr. Lewis testified that he visits Altoona several times each year with the primary purpose of selling drugs. Id. at 7. He confirmed he knew Appellant from the neighborhood, he borrowed $80 from Appellant, and he invited Appellant to Altoona. Id. at 8-9. Mr. Lewis testified he was in Altoona at a friend's house when he paid "Jordan" to transport Appellant to Altoona for a "hotel party with some females." Id. at 9-10. Mr. Lewis testified that Christopher Woomer rented Room 217 at the Motel 6 for the "party." Id. at 11. Mr. Lewis testified that, after Mr. Woomer paid for the room, Mr. Lewis went to the room and stashed his drugs, binoculars, bullets, and guns. Id. at 12. He then began making plans to sell the drugs, including to the CI at issue. Id. at 12-13.

Mr. Lewis testified Appellant arrived in Altoona with Jordan about an hour after he finished the transaction in the Big Lots parking lot with the CI and he gave Appellant $80, which he owed him. Id. at 14, 18. He testified that he, Appellant, and Jordan went to the Big Lots to buy a speaker, bought food at a KFC, bought marijuana, and went back to the room. Id. Mr. Lewis indicated his contraband remained hidden. Id. at 15.

Mr. Lewis explained he left the motel, informing Appellant he was going to buy more marijuana, and he was then arrested by the police. Id. Mr. Lewis confirmed that he pled guilty to various charges in connection with the offenses at issue, including the sale of the narcotics to the CI in the Big Lots parking lot, the possession of the gun and drugs found on his person, and the

contraband found in the motel room. Id. at 23-24. He denied Appellant was involved in the illegal activity, conspired with him, or had any knowledge of either the illegal activity or contraband. Id. at 18. He further denied Appellant or he ever possessed a key card for the room. Id. at 20. Mr. Lewis denied that he was trying to "protect" Appellant; but rather, he testified he was "speaking the truth." Id. at 22.

At the conclusion of the testimony, the jury convicted Appellant of the offenses indicated supra, and on March 9, 2017, the trial court sentenced Appellant to an aggregate of thirty-eight months to seventy-six months in prison. This timely, counseled appeal followed, the trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement, Appellant timely complied, and the trial court filed a 1925(a) opinion.

Appellant first contends the trial court erred in denying his pre-trial motion to suppress the physical evidence seized by the police. Specifically, Appellant argues (1) there were no exigent circumstances permitting the police's warrantless entry into the motel room, (2) the police violated the "knock and announce" rule when they entered the motel room, and (3) the search warrant for Room 217 was not supported by probable cause.

We review the denial of a motion to suppress as follows:

An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before

the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record[.] Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

Commonwealth v. Jones, 121 A.3d 524, 526-27 (Pa.Super. 2015) (citations, alterations, and ellipsis omitted).

"Both the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee individuals freedom from unreasonable searches and seizures." Commonwealth v. Bostick, 958 A.2d 543, 550 (Pa.Super. 2008) (quotation marks and quotation omitted). "[W]arrantless searches and seizures are … unreasonable per se, unless conducted pursuant to a specifically established and well-delineated exception to the warrant requirement." Id. at 556. One exception to the warrant requirement is when probable cause and exigent circumstances are present. "Absent probable cause and exigent circumstances, warrantless searches and seizures in a private home violate both the Fourth Amendment [of the United States Constitution] and Article I[,] § 8 of the Pennsylvania Constitution." Commonwealth v. Bowmaster, 101 A.3d 789, 792 (Pa.Super. 2014) (citation omitted). These constitutional protections have

been extended to include a person's hotel room.[7]  See Commonwealth v. Dean, 940 A.2d 514, 521 (Pa.Super. 2008) (stating "[w]arrantless searches and seizures inside a … hotel room are presumptively unreasonable unless the occupant consents or probable cause and exigent circumstances exist to justify intrusion") (citations and parentheses omitted)).

Thus, prior to the police making a warrantless entry into the motel room in the instant case, the police needed (1) probable cause and (2) exigent circumstances.  Here, Appellant does not allege the police entered the motel room absent probable cause;[8] however, he asserts the officers' warrantless entry was not supported by exigent circumstances.

> This Court addressed the issue of police entry without a warrant and exigent circumstances in Commonwealth v. Demshock, 854 A.2d 553 (Pa.Super. 2004).  We observed there that various factors need to be taken into account to assess the presence of exigent circumstances; for example: (1) the gravity of the offense; (2) whether the suspect is reasonably believed to be armed; (3) whether there is a clear showing of probable cause; (4) whether there is a strong reason to believe that the suspect is within the premises being entered; (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended; (6) whether the entry is peaceable; (7) the timing of the entry;

_____

[7] We shall assume, arguendo, Appellant established that he had a legitimate expectation of privacy in the hotel room at issue.  See Commonwealth v. Enimpah, 630 Pa. 357, 106 A.3d 695, 702 (2014) (holding that although a defendant charged with a possessory offense has automatic standing to challenge the suppression of the items seized, he must additionally demonstrate that he had a reasonable expectation of privacy in the place searched).

[8] As discussed infra, Appellant contends the search warrant was issued absent probable cause, which is an inquiry separate from the police's warrantless entry into the motel room.

(8) whether there is hot pursuit of a fleeing felon; (9) whether there is a likelihood that evidence will be destroyed if police take the time to obtain a warrant; and (10) whether there is a danger to police or other persons inside or outside of the dwelling to require immediate and swift action. Demshock, 854 A.2d at 555–56.

Dean, 940 A.2d at 522.

"An inquiry to determine whether exigent circumstances exist involves a balancing of the individual's right to be free from unreasonable intrusions against the interest of society in investigating crime quickly and adequately." Commonwealth v. Caple, 121 A.3d 511, 518 (Pa.Super. 2015) (quotation marks and quotations omitted). "It requires an examination of all of the surrounding circumstances in a particular case." Id.

Here, in explaining its ruling that sufficient exigent circumstances existed to support the police's warrantless entry into Room 217, the suppression court indicated the following:

> Here, officers had strong reason to believe [Appellant] was within the motel room as they had observed him conducting counter-surveillance. The officers reasonably believed [Appellant] was armed, given their past experience with drug distribution at this particular motel and due to the fact that the [co-conspirator] was armed [when police seized him]. Therefore, officers had reason to fear for their own safety and the safety of others within the motel if they did not act quickly. Officers obtained a key to the room prior to entering, to eliminate the need for a violent or forced entry.
>
> Additionally, the [co-conspirator] eventually admitted that he did not have a key to the room and would need to call [Appellant] to return to the room. The fact that [Appellant] would be awaiting a phone call from his [co-conspirator] also gave officers reason to believe that [Appellant] would either flee or destroy evidence if officers did not act quickly. The officers reasonably believed that a failure of the [co-conspirator] to return

to the room would tip [Appellant] off to the presence of the police officers. This created a circumstance where officers did not believe they could obtain a search warrant in the time frame in which the [co-conspirator] would be expected to return to the room.

The record reflects that the officers reasonably believed that such exigent circumstances existed so as to create the possibility that evidence may have been removed or destroyed in the time it would take to obtain a search warrant. Therefore, the warrantless search of the motel room was not unreasonable and does not justify suppression of the evidence.

Suppression Court Opinion, filed 11/18/16, at 6-7.

We agree with the suppression court's sound reasoning and find no merit to Appellant's first suppression claim.

With regard to Appellant next suppression claim, he contends that when the police initially entered Room 217 they violated the "knock and announce" rule as set forth under Pennsylvania Rule of Criminal Procedure 207.

Pa.R.Crim.P. 207 provides:

(A) A law enforcement officer executing a search warrant shall, before entry, give, or make reasonable effort to give, notice of the officer's identity, authority, and purpose to any occupant of the premises specified in the warrant, unless exigent circumstances require the officer's immediate forcible entry.

(B) Such officer shall await a response for a reasonable period of time after this announcement of identity, authority, and purpose, unless exigent circumstances require the officer's immediate forcible entry.

(C) If the officer is not admitted after such reasonable period, the officer may forcibly enter the premises and may use as much physical force to effect entry therein as is necessary to execute the search.

Pa.R.Crim.P. 207.

The suppression court held that Appellant was not entitled to relief under Rule 207. Specifically, the court held:

> [T]he language of the [R]ule clearly states that it applies to an officer's conduct in "executing a search warrant." No warrant was obtained in this case until after the [police entered] the motel room at issue. Therefore, it is appropriate to [ ] to analyze the facts under the. . .framework of exceptions to the warrant requirement.

Suppression Court Opinion, filed 11/18/16, at 5.

Appellant has not provided us with any authority indicating that Rule 207 applies when the police enter a motel room absent a warrant. In any event, it is well settled that the Rule's requirements are relaxed in the presence of exigent circumstances. Commonwealth v. Frederick, 124 A.3d 748, 754-55 (Pa.Super. 2015). For instance, our Court has recognized exigent circumstances exist for Rule 207 purposes where "the police have reason to believe that an announcement prior to entry would imperil their safety[,] or [] the police have reason to believe that evidence is about to be destroyed." Id. at 755 (footnote, quotation, and citations omitted). The suppression court's factual findings, as discussed supra, support the conclusion that both of these circumstances were present in this case, and thus, Appellant is not entitled to relief on this claim.

In his final suppression claim, Appellant contends the search warrant for Room 217 was not supported by probable cause.

> A search warrant may issue only upon a demonstration of probable cause by an affiant. See generally Commonwealth v. Gary, 625 Pa. 183, 91 A.3d 102, 107 (2014). The existence of

probable cause is measured by examining the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he [or she] has reasonably trustworthy information are sufficient in and of themselves to warrant a [person] of reasonable caution in the belief that a search should be conducted." Commonwealth v. Johnson, 615 Pa. 354, 42 A.3d 1017, 1031 (2012) (internal quotation marks and citation omitted). A magisterial district judge, when deciding whether to issue a search warrant, must "make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit…including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. (citation omitted). Conversely, "[a] court reviewing a search warrant determines only if a substantial basis existed for the magistrate to find probable cause." Id. (citation omitted).

Commonwealth v. Jacoby , --- Pa. ---, 170 A.3d 1065 (2017).

Here, the affiant was Sergeant Moser, and the affidavit of probable cause submitted to the issuing authority in support of the search warrant for Room 217 of the Motel 6 stated in full:

Your Affiant is Sgt Christopher Moser of the Altoona City Police Dept. Your Affiant attended Johnstown Regional Police Academy where I received mandatory police training under Act 120. Your Affiant was previously employed by the Williamsburg and Tyrone Borough Police Departments. Your Affiant has been employed by the City of Altoona Police Dept. since March 1st, 2005[,] and is a member of the Blair County West IV Drug Task Force. Your Affiant has received training and also has experience in narcotics investigations and arrests. As such, your Affiant is empowered to apply for, obtain and serve search warrants, make seizures and make arrests in the course of investigation into the various laws of the Commonwealth of Pennsylvania, including drug violations. Your Affiant also completed a one week Wiretapping School held by the Pennsylvania State Police, commonly referred to as "A" School. Your Affiant is "A" certified and was assigned [a] certification number[.]

- 18 -

Upon information and belief there is presently concealed within [Motel 6] Room 217 Altoona PA. . .those items set forth in attachment "A," attached, which items constitute evidence of violations of Title 35, Section 13(a)(30). Probable cause belief is based upon the following facts and circumstances:

Based upon your Affiant's education, training and experience I know:

Narcotic traffickers maintain books, records, notes and other papers relating to the distribution of controlled substances. That they often "front" or provide on consignments, controlled substances to their customers.

That it is common for drug dealers to keep controlled substances and/or contraband, proceeds of drug sales and records within their residence, vehicle(s) and on their person, ready for access, but concealed from law enforcement.

That it is common for persons involved in narcotics trafficking to maintain evidence relating to their obtaining, secreting, transferring, concealing and/or expending narcotics proceeds, such as large amounts of currency, precious metals and jewelry, book records, invoices, receipts, records of real estate transactions, bank statements and related records, certificates of deposit, cashier checks, bank checks, safe deposit keys, money wrappers and other evidence of financial transactions. These items are maintained by narcotics traffickers in their residences, at their businesses, in their vehicles, at residences of associates and in safe deposit boxes.

It is also common for narcotics traffickers to secure or secrete items in their residences, to conceal those items from law enforcement. Such common areas would include but not be limited to hiding items in floor boards, ceiling tiles and within walls[.]

TO WIT: On 7-12-15 CI 4017-15 contacted Affiant/Reporting Officer ("R/O") and stated he could purchase heroin from Darrell Lewis. The CI stated he was in contact with Lewis at [a specific phone number]. The CI told Lewis that he had $100.00 and needed heroin. Lewis told the CI to meet him at Big Lots when he was ready.

The CI met at the APD N/O with R/O, Cpl Plummer and Ptlm Crist. At 1545 hrs, Ptlm Crist strip searched the CI with negative findings for drugs and/or monies. R/O gave the CI $100.00 in pre-recorded task force funds to purchase the heroin.

R/O and Ptlm Crist provided cover/surveillance. Cpl Plummer transported the CI in an undercover capacity. Officers arrived in the area of Big Lots [ ] at approximately 1614 hrs. R/O and Ptlm Crist observed Lewis standing under the awning of the Vape Vibe store meeting with an unknown male. R/O called Cpl Plummer and advised him that Lewis was meeting with someone and to have the CI call him. R/O and Ptlm Crist then observed Lewis separate from the unknown male and walk up a set of steps to the Motel 6. Lewis walked out of sight as he walked to the back side of the motel.

At 1615 hrs the CI called Lewis to tell him he was there, in the presence of Cpl Plummer. The CI exited Cpl Plummer's vehicle and walked to the front of Big Lots. R/O and Ptlm Crist took a surveillance position near ComPros. At 1618 hrs the CI walked to the steps that lead to Motel 6. R/O and Ptlm Crist observed Lewis emerge from the back side of Motel 6 and walk to meet with the CI. Ptlm Crist exited R/O's vehicle and took a surveillance position in the wooded area behind Motel 6. The CI and Lewis met at the top of the steps and then walked to Big Lots parking lot together. The CI returned to Cpl Plummer's vehicle and turned over (5) white wax packets of heroin stamped Live High with a Superman Logo. Cpl Plummer departed with the CI.

R/O observed Lewis enter the Big Lots store and exit at approximately 1625 hrs. At 1628 hrs Lewis went back into Big Lots and exited at 1629 hrs. R/O observed Lewis was on his phone during this time and appeared to be waiting for someone. At 1632 hrs R/O observed Lewis meet with a white male that had exited a white Dodge Neon bearing [a specific PA license plate]. Lewis and the white male walked up the steps leading to Motel 6. R/O observed (2) other white males in the Dodge Neon that were observing and pointing at Lewis and the unknown white male.

R/O called Ptlm Crist to advise him that Lewis may be walking back to his motel room. R/O took a surveillance position in the parking area of the 100/200 rooms. At 1637 hrs Ptlm Crist advised R/O that Lewis was walking back to the area where R/O was parked. Lewis walked directly behind R/O's vehicle. R/O observed Lewis enter Room 217.

R/O and Ptlm Crist returned to the APD N/O and met with the CI and Cpl Plummer. At 1643 hrs Cpl Plummer strip searched the CI with negative findings for drugs and/or monies. At 1649 hrs Cpl Plummer conducted a field test on a portion of the heroin with a positive response for the same. The heroin was packaged

and placed into APD Evidence along with a PSP Lab Analysis Request for additional processing. The CI provided a verbal and written statement in regards to this incident.

The CI stated he met with Lewis at the top of the stairs at Motel 6. The CI stated that he gave Lewis the $100.00 in task force funds and Lewis gave the CI the (5) packets of heroin. The CI then parted ways with Lewis and returned to Cpl Plummer.

R/O then contacted other officers to return to Motel 6 to take Lewis into custody. R/O, Ptlm Crist and Agent Brandt went to the 100/200 area of Motel 6 parking lot and maintained surveillance on room 217. Sgt Merrill, Sgt Sapienza, and Ptlm Swope conducted surveillance on the office side of Motel 6. Officers arrived at Motel 6 at approximately 1830 hrs. Officers observed the curtain to the room was open and a black male was constantly peering out of the window. At 1928 hrs officers observed a silver sedan bearing [a specific PA license plate] arrive and park in front of the motel room. Ptlm Crist was able to identify the operator of the vehicle as Jeremiah Morgan. Officers observed that Lewis was in the front passenger seat. Lewis exited the vehicle and entered Room 217. Morgan then departed in the vehicle. Officers observed that the unknown black male and Lewis continued looking out of the window. At 1947 hrs the unknown black male exited the room, walked around the corner briefly and then returned to the room. At 2020 hrs Lewis exited the room and walked towards the office side of the motel. R/O radioed to Sgt Merrill and other units that Lewis was walking their way. Officers then took Lewis into custody on the controlled delivery[.]

Sgt Merrill stated when they encountered Lewis he was compliant and on his phone. Sgt Merrill identified himself as a police officer and told Lewis to place his hands in the air, which he did. Lewis was then placed into custody and advised he was going to be searched. Lewis stated that he had a gun in his pocket. Sgt Merrill provided Lewis with his Miranda warnings and asked him if he knew why he was being arrested. Lewis stated "it was because he had a gun on him." Sgt Merrill advised Lewis that he was under arrest for a drug delivery. Ptlm Swope searched Lewis and recovered a Charter Arms Pink Lady 38 special revolver bearing [a specific serial number]. The gun was found in Lewis' right front pocket. Ptlm Swope also located (6) packets of heroin stamped Live High with a Superman log in Lewis' left front pocket. Lewis was placed into custody and officers called for a transport vehicle[.]

While officers were waiting for a transport vehicle to arrive on scene, a black male identified as Darnell Adams approached officers. Officers [made] contact [with] Adams and observed he was on his phone and appeared to be looking for someone. Ptlm Swope noted that Lewis' phone was ringing while Adams approached them. Adams was detained briefly and provided his Miranda warnings. Adams stated that he was friends [with] Lewis, who he knew as "Ace," and he was coming to meet him but would not specify why.

Due to the fact that the unknown black male was still in the motel room and could easily destroy any remaining evidence, once it was apparent Lewis would not be returning to the room due to his arrest, Sgt Merrill made contact at the front desk at Motel 6. Sgt Merrill advised the clerk that officers would be securing Room 217 for a search warrant and requested a key card for the room. Sgt Merrill was given a key card for the room at approximately 2035 hrs. Officers then moved to a location around the room. Ptlm Swope utilized the key card to open the door and officers made entry, announcing as police officers. The unknown black male, identified as [Appellant] was found lying on a bed in the room. Wilson was placed into detention and advised of his Miranda warnings. R/O advised Wilson that officers would be obtaining a search warrant for the room and he was being detained until the issuance and execution of the search warrant.

Sgt Sapienza, Ptlm Crist and Agent Brandt are currently waiting with Wilson at the room until a search warrant can be obtained.

Night Time Search Requested:

Due to the time of application R/O requests approval for night time search. Officers currently have the room secured and Wilson is detained at the room with officers.

Affidavit of Probable Cause, dated 7/12/15.

We are mindful that, "[i]n dealing with probable cause, [ ] as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States,

338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Thus, viewing the information contained in Sergeant Moser's affidavit accordingly, we reject Appellant's arguments that the affidavit lacked probable cause to believe "that any contraband would be located in Room 217." Appellant's Brief at 11. The affidavit, on its face, provided a substantial basis for the magistrate to find probable cause to indicate that contraband, specifically narcotics and illegal proceeds, would be found in the subject motel room. See Jacoby, supra.

Specifically, Sergeant Moser detailed a controlled buy of heroin, which occurred at a Big Lots parking lot next to a Motel 6, between a CI and Mr. Lewis. Further, he detailed Mr. Lewis' meetings with other individuals before and after the instant controlled buy, concluding the meetings were consistent with the dealing of narcotics, as well as Mr. Lewis' comings and goings from the motel. Sergeant Moser noted that officers specifically viewed Mr. Lewis, as well as Appellant who constantly peered out of the motel window, in Room 217. Sergeant Moser indicated that, based on his training and experience, it was common for drug dealers to keep contraband, proceeds from their sales, and other items concealed from law enforcement but within ready access. Moreover, Sergeant Moser indicated that, upon Mr. Lewis' arrest, the police found a gun and packets of heroin on Mr. Lewis' person. Accordingly, we find no merit to Appellant's final suppression claim.

In his final issue, Appellant contends "[t]he evidence was insufficient to convict relative to all charges."[9] See Appellant's Brief at 14. Specifically, he argues that he was merely present in the motel room and, at most, he is "guilty of sitting on the bed listening to music and smoking some marijuana while waiting for his hometown friend and some young ladies to arrive to the [m]otel." Appellant's Brief at 16. We find Appellant's sufficiency claim is waived.

With regard to issue preservation, this Court has held:

> Pennsylvania Rule of Appellate Procedure 1925(b) provides, inter alia, "Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived." Pa.R.A.P. 1925(b)(4)(vii). In Commonwealth v. Garland, 63 A.3d 339 (Pa.Super. 2013), this Court found the appellant had waived his sufficiency of the evidence claim where his 1925(b) statement simply averred the evidence was legally insufficient to support the convictions and in doing so reasoned:

> In order to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's Rule 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient. Such specificity is of particular importance in cases where. . .the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt. Here, as is evident, [the a]ppellant. . .failed to specify which elements he was challenging in his Rule 1925(b) statement. . . .Thus, we find [his] sufficiency claim waived on this basis. Id. at 344 (citations omitted).

_____

[9] In the argument portion of his brief, Appellant "acknowledges he is guilty of [ ] possession of a small amount of marijuana, if in fact the search warrant and method of arrest is determined valid[.]" Appellant's Brief at 16.

Commonwealth v. Stiles, 143 A.3d 968, 982 (Pa.Super. 2016) (footnote and some quotation marks omitted) (concluding the appellant waived sufficiency claim where his concise statement failed to clearly state any element upon which the alleged evidence was insufficient).

In the case sub judice, Appellant was convicted of eight separate offenses, each of which contains multiple elements. In his concise statement, he presented his sufficiency claim as follows: "The evidence was insufficient to convict relative to all charges." Rule 1925(b) Statement, 4/18/17, at 1 ¶ 2. This vague statement fails to "state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient[,]" and is inadequate to preserve his claim. Stiles, supra at 982 (citation omitted). Accordingly, Appellant's sufficiency issue is waived.[10]

For all of the foregoing reasons, we affirm.

Affirmed.

P.J.E. Bender joins the memorandum.

Judge Strassburger concurs in the result.

_____

[10] In any event, we note the entire "gist" of Appellant's argument is that he was merely present in the motel room, did not have any knowledge of the contraband in the room, and did not conspire with Mr. Lewis. In so arguing, Appellant points to his and Mr. Lewis' trial testimony. However, the jury was free to discount their testimony. See Stiles, supra. Further, as detailed supra, applying the appropriate standard of review, the evidence supports the jury's verdict that Appellant was not "merely present;" but rather, he was an active participant who conducted "counter-surveillance" and held the drug proceeds. See id. (setting forth standard of review for sufficiency of the evidence claims).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:   2/05/2018